# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### June 29, 2016 Session

## STATE OF TENNESSEE v. DEVONTAVIOUS BRYANT

### Appeal from the Criminal Court for Hamilton County
### No. 286590   Don W. Poole, Judge
_____

### No. E2015-01187-CCA-R3-CD – Filed September 21, 2016
_____


The Defendant, Devontavious Bryant, along with co-defendant Deacon Williams, was indicted with one count of aggravated rape, one count of aggravated robbery, and one count of aggravated assault.  Prior to trial, the State amended the aggravated robbery charge to robbery and dismissed the aggravated assault charge.  The Defendant was tried separately from Mr. Williams and convicted of aggravated rape and robbery.  On appeal, the Defendant argues that: (1) the evidence collected from a warrantless search of his bedroom should have been suppressed; (2) the video recording of the victim's statement given minutes after the offense should have been suppressed under Tennessee Rule of Evidence 403; and (3) there was insufficient evidence to support his conviction for aggravated rape because his DNA was not found at the scene.  Discerning no error, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Joshua P. Weiss, Chattanooga, Tennessee, for the appellant, Devontavious Bryant.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Neal Pinkston, District Attorney General; and Cameron Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual and Procedural Background

*Motion to Suppress Video of the Victim's Statement*

Prior to trial, the State filed a motion in limine requesting that the trial court rule on the admissibility of video recorded statements made by the victim[1] in a police car immediately after the alleged offense. The State averred that the video statement was admissible under the excited utterance exception to the hearsay rule.

Chattanooga Police Department ("CPD") Officer Daryl Slaughter testified that, around 6:15 a.m. on October 12, 2012, he was dispatched to investigate an alleged rape. He recalled that the victim had waved down a motorist near the scene of the incident and that the motorist had taken her to PSC Metals and called 911. Officer Slaughter met the victim and the motorist at PSC Metals, and the victim spoke with Officer Slaughter. Officer Slaughter recalled that victim "was terrified, crying, couldn't make out a complete sentence, just really tore up. You could tell she had been through something pretty traumatic." The victim told Officer Slaughter that she had been raped by two males near Finley Stadium and that it had "just happened." Officer Slaughter stated that his patrol vehicle was equipped with a video camera and that he had activated it during his conversation with the victim.

The State played a forty-seven minute video of Officer Slaughter's conversation with the victim. The video showed the victim speaking with Officer Slaughter in front of his vehicle. She was sobbing and had difficulty speaking as she described the rape. She stated that she was running near the stadium when she saw a bicycle roll by her. Then someone grabbed her from behind and demanded her cell phone. She informed the person that she did not have a cell phone, and he said, "[G]ive me everything you have[,]" so she gave him her MP3 player. After that, the victim "thought they left." Then, the victim recalled that "the other one grabbed [her] and [she] passed out." She also stated that one the assailants threw her to the ground and demanded that she "either had to suck his c—k or take off [her] pants." The victim reported that she "just laid there" and that the two assailants took off her pants and her shoes and then raped her. She stated that the man in a dark hoodie raped her first then a man in the yellow hoodie raped her. The victim recalled that the man in the yellow hoodie had a knife.

After the victim described the rape, Officer Slaughter allowed her to sit in the back of his patrol car while he spoke to the motorist. The video showed the victim sobbing and having difficulty breathing while seated in the back seat of the patrol car. The victim

---

[1] Pursuant to this Court's policy, victims of sexual offenses are not identified by their names.

then agreed to take Officer Slaughter back to the scene of the rape, and she continued to sob as she directed the officer to the scene. When they arrived at the scene, the victim showed Officer Slaughter where the attack took place, all while crying. Later, the victim said that there were other people in the area who might have seen the assailants. The victim then sat in the back of Officer Slaughter's car while he spoke with other officers, and she continued to cry and breathe heavily. Then, at Officer Slaughter's request, the victim walked through the crime scene with officers and described where the assault and rape took place. She said she first saw the assailants as she ran by the In and Out Café; they were standing by their bicycles near the newspaper stand. She described the assailants as two "young African-American men," one of which was wearing a yellow shirt and had an Afro, "but it was more like dreads." She stated that, after they took her MP3 player, she turned to leave, but one of the assailants grabbed her by the neck, and she passed out. When she regained consciousness, she was on the ground and could not breathe. She started to scream, but one of the assailants said, "[I]f you don't stop screaming, I'm going to break your face." While describing the rape, the victim began to cry.

Officer Slaughter then allowed the victim to call her husband. While speaking on the phone, the victim again began to sob and have difficulty breathing. She eventually calmed down, but she continued to cry. Officer Slaughter then transported the victim to the Rape Crisis Clinic, and while they were driving, the victim showed Officer Slaughter where she first saw the assailants.

The Defendant argued that, if the court allowed the video to be introduced, then "the video itself would be inappropriate" and that "a transcript of the video would be [] most appropriate in this situation." The trial court ruled that the video was an out-of-court statement but that it fell within the excited utterance exception to the hearsay rule and therefore was admissible.

The next day, the Defendant filed a motion in limine arguing that the video should be excluded under Tennessee Rule of Evidence 403. The Defendant contended that the video "portray[ed] [the victim] crying and hyperventilating" and that "it serve[d] no other purpose but to inflame the jury." The Defendant asserted that the probative value of the video was substantially outweighed by the danger of unfair prejudice, and he suggested that a transcript of the video be introduced in order to "avoid the prejudicial nature of the video." At a hearing on the motion, the State argued that the video was "highly probative" and that the victim's emotional state on the video did not substantially outweigh the video's probative value.

The trial court stated that the transcript of the video would only be given to the jury "to help them understand what may or may not be on the video." The trial court held that the video was the evidence and noted that it would instruct the jury "that if the[ir]

listening or determination of what they heard on that video is different than what's transcribed, then they should follow what they listen [to] or hear." The trial court concluded that the video was admissible under Tennessee Rule of Evidence 403.

*Motion to Suppress Evidence from the Defendant's Bedroom*

The Defendant filed a motion to suppress evidence found in his bedroom, alleging that the search violated his Fourth Amendment rights against unreasonable search and seizure.

CPD Sergeant Daniel Francis testified that, in October 2012, he was notified that a rape had taken place near the football stadium in Chattanooga. Sergeant Francis spoke with the victim and learned that she was jogging and was attacked by two black males, one with a "lighter-colored jacket" and one with a "darker-colored jacket." The assailant wearing the lighter-colored jacket also had "a very large [A]fro," which might have been a wig. Sergeant Francis sent the victim's description of her assailants to the entire police department, and the next day, other officers informed Sergeant Francis that they had seen two people matching that description in the City Café just prior to when the attack took place. Sergeant Francis obtained security video from the City Café showing two people matching the description given by the victim sitting at a table. That video was released to the news media.

About a week later, the mother of Vontrell Haddox called police to inform them that she had seen her son wearing the yellow jacket that was in the video released to the news media. Sergeant Francis then went to speak with Mr. Haddox. Initially, Mr. Haddox claimed that "somebody just randomly traded him the jacket on the street[.]" However, Mr. Haddox later admitted that he had "traded a gray jacket to [the Defendant] for the yellow jacket[.]"

On October 24, 2012, Sergeant Francis and Officer Gary Williams[2] went to the Defendant's home and knocked on the door. Initially, a female opened the back door and told Sergeant Francis that the Defendant did not live there. However, a neighbor informed them that the Defendant was inside the residence and that the person who came to the back door was lying. Sergeant Francis remained at the back door while Officer Williams knocked on the front door "for about ten more minutes" before the Defendant opened the front door. Officer Williams confirmed the Defendant's identity and asked if police could talk to him. The Defendant said, "No," and he "tried to slam the door on [Officer Williams.]" However, the Defendant was unable to close the door because

---

[2] In his testimony from the suppression hearing, Sergeant Francis said he was accompanied by "Officer Aaron Williams" to the Defendant's residence. However, from the rest of the record, it is clear that the officer's first name is Gary.

- 4 -

Officer Williams had placed his foot in the door. Officer Williams then "immediately" placed the Defendant under arrest. Sergeant Francis could hear yelling, so he came to the front door. The Defendant's mother, Lisa Bryant, came downstairs and asked what was going on. Sergeant Francis informed her that the Defendant was under arrest for rape, and Ms. Bryant responded, "Well, last time that happened, they brought him back the same day." Sergeant Francis then transported the Defendant to the police station to be interviewed. Sergeant Francis confirmed that he did not have an arrest warrant or a search warrant when he went to the Defendant's residence. Sergeant Francis denied going into the Defendant's bedroom when he was arrested, but he did not know whether Officer Williams went into the Defendant's bedroom at that time.

The next day, Sergeant Francis returned, with one other officer, to the Defendant's home to talk to Ms. Bryant "to see if [he] could get a consent to search signed[.]" Sergeant Francis confirmed that he did not have a search warrant. Ms. Bryant was home with one of her other sons. Ms. Bryant informed Sergeant Francis that she lived in the residence and that the Defendant did not always stay with her and often stayed with friends. On nights when he did stay with Ms. Bryant, the Defendant slept in a bedroom with his brother. Sergeant Francis gave Ms. Bryant a consent to search form, and he explained the form in detail. Sergeant Francis denied threatening, coercing, or making any promises to Ms. Bryant. Ms. Bryant signed the form. Ms. Bryant led the officers to the Defendant's bedroom. Sergeant Francis recalled that the bedroom door was unlocked, and he stated that he believed Ms. Bryant had the authority to consent to a search of the bedroom because her name was on the lease. Sergeant Francis found two condom wrappers in the bedroom the Defendant shared with his brother. Those condom wrappers matched one of the brands of condom wrappers found at the scene. He also found a used condom in the trash can.

Lisa Bryant testified that she was the Defendant's mother. On the day he was arrested, Ms. Bryant was awakened by a scream. When Ms. Bryant came downstairs, she saw that the Defendant was being arrested. Ms. Bryant also observed an officer come out of the Defendant's bedroom upstairs. Ms. Bryant stated that she had not consented to a search at that time. The next day, officers returned to Ms. Bryant's home and showed her a consent to search form. Ms. Bryant admitted that she signed the document, but she said that she thought she was signing a consent form to allow the officers to come into her house and "look around," not to search the house. She claimed that the officers did not read the consent form to her or tell her that she did not have to sign it. However, Ms. Bryant also stated that she was not coerced and that she did not feel like she had to sign the form. Also, Ms. Bryant stated that she went into the Defendant's bedroom "all the time." She noted that the Defendant stayed with her "[p]robably every other night." Ms. Bryant admitted that she did not tell officers there was a portion of the residence that they could not search. Ms. Bryant confirmed that she could read and write.

The trial court found that the Defendant's warrantless arrest inside his residence did not fall within one of the exceptions to the warrant requirement. However, regarding the search, the trial court found that Ms. Bryant had given voluntary consent for the police to search her residence. Specifically, the court noted that Ms. Bryant testified that she was aware that the officers would come in and "look around" and that she signed a consent form allowing them to do so. Furthermore, the trial court noted that Ms. Bryant did not object to officers searching any room in her home. Additionally, the trial court found that Ms. Bryant's consent "was sufficiently attenuated from the previous day's unconstitutional entry." Therefore, the Defendant's motion to suppress the evidence found in his bedroom was denied.

*Trial*

The victim testified that, on October 12, 2012, she dropped off her belongings at a gym between 5:30 and 6:00 a.m. and went for a run in downtown Chattanooga. She was carrying an MP3 player and "a little baggie with gum in it." Her running route took her toward the First Tennessee Pavilion. As she was running, she saw two black men on bicycles near the In and Out Café on Chestnut Street. One was wearing a gray hoodie and the other was wearing a yellow hoodie and had a "really big [A]fro[.]" The victim continued to run toward First Tennessee Pavilion and Finley Stadium. When she reached Reggie White Boulevard, she saw a bicycle roll past her without a rider, and then someone grabbed her around the neck. The person demanded her phone and money, but she told them she was not carrying either. The person then asked what she was listening to, and the victim responded an MP3 player. The person said, "[G]ive me that," and the victim handed the MP3 player to the assailant. When she handed over the MP3 player, she saw that the assailant had black skin and was wearing a gray top. At that point, the victim saw the person with an Afro hairstyle and wearing the yellow hoodie approach. The victim identified the Defendant as the person with the Afro and wearing the yellow hoodie.

After she handed over her MP3 player, the victim turned to go back to the gym. However, the Defendant grabbed the victim around the throat and picked her up off the ground, causing her to pass out. When the victim regained consciousness, she was on an embankment. The person in the gray hoodie asked her "what [she] was going to do, what [she] would do for [her] life." The Defendant told her that he had a knife and that he "was going to break [her] face if [she] would scream." The person in the gray hoodie gave the victim the choice of either performing fellatio or taking off her pants. The victim tried to get away, but the person in the gray hoodie took off her pants. He raped her first, followed by the Defendant. The victim testified that neither individual's penis was fully erect, but she stated that both of them penetrated her. After they finished, they left. The victim "sat there for a second[,]" put her clothes back on, and then ran toward

the First Tennessee Pavilion to find help. The victim stopped the first car she saw. The driver drove her to PSC Metals, called 911, and stayed with her until the police arrived.

The victim stated that she identified the Defendant in a photo lineup approximately one week after the offense. She said she did not know the Defendant and had not seen him on the news. The victim identified a photo of a plastic bag from the crime scene as the bag she was carrying with gum. The victim said the phone found at the crime scene did not belong to her.

On cross-examination, the victim said she did not get a good look at the face of the person in the gray hoodie because his hood was covering his face. However, she was able to see the Defendant's face because his hair prevented him from pulling his hood over his face. The victim said she did not see any condoms, but she recalled the Defendant ripping something that was approximately the size and shape of a condom wrapper. The victim said she never saw a knife.

Jeffrey Brown testified that he was on his way to work on the morning of October 12, 2012, when the victim "flagged [him] down" and told him that she had been raped. Mr. Brown took the victim to a well-lit area in the PSC Metals parking lot, called 911, and waited with her until the police arrived. Mr. Brown recalled that the victim was crying, shaking, and breathing hard. The victim informed Mr. Brown that the rape had just occurred. The 911 call was played for the jury, and in that recording, the victim described her assailants as two young, black males, stating that one was wearing a yellow hoodie and had dread locks and the second assailant was wearing a dark-colored hoodie. Mr. Brown also reported that the victim told him that the assailants said that they had a knife. On cross-examination, Mr. Brown stated that it did not appear that the victim had been physically beaten.

CPD Officer Daryl Slaughter testified that he responded to PSC Metals. There, he spoke with the Mr. Brown and the victim. Officer Slaughter stated that the victim was crying, had difficulty breathing, and "appeared to have been traumatized." The victim told him that she was running and that she had been raped. Officer Slaughter stated that his conversation with the victim was recorded by the video recorder in his patrol car. That video was played for the jury. The jury was also provided a transcript of the video, but the court instructed the jury that the video itself, not the transcript, was evidence. On cross-examination, Officer Slaughter agreed that the victim declined calling an ambulance to take her to the hospital. Officer Slaughter also stated that his primary task was to take a statement from the victim and transport her to the Rape Crisis Center; he was not in charge of preserving the crime scene.

Amy Griffin testified that she was the nursing director at the Partnership Rape Crisis Center and that she conducted a forensic examination of the victim. Ms. Griffin

recalled that the victim appeared to be very upset. As the victim described the events that occurred, Ms. Griffin typed her statement. In her statement, the victim said she was running when she saw two black males standing with their bicycles. The victim continued her run and saw a bicycle roll past her without a rider. At that point, someone grabbed her around her neck from behind and demanded her phone and money. The victim said she did not have either. The assailant then demanded her MP3 player, and the victim gave it to him. The assailant dropped the MP3 player on the ground, and a second male wearing a yellow hoodie picked it up, and both males turned as if to leave. As typed by Ms. Griffin in the "narrative history" portion of the Sexual Assault Examination Form, which was entered as an exhibit, the victim described what happened next as follows:

> So I turned back around and headed back toward the gym. I thought I had just been mugged. That's when the one in the yellow hoodie came up and put his arm around my neck and choked me out. Next thing I know when I woke up, he told me "You've got two choices. You can either take off your pants or suck my d—k." I wouldn't do it. I just sat there on the ground like this. ([V]ictim describes holding one knee close to her chest.) I froze. And then I said "No" and started screaming. I was down an embankment and I turned and tried to get away. And that's when the one in the dark hoodie pulled me and pulled my pants down and told me to stop screaming. One of them said, "I have a knife[."] Then he started trying to have sex with me from behind, but he couldn't. And then he flipped me over. I started screaming. I saw headlights and screamed. And the one with the yellow hoodie held his fist up above my head and said[,] "[I]f you don't shut up I'm going to break your face[."] And then the other one got up and said[,] "[I]t's your turn[]" to the one in the yellow. And he tried but couldn't. Thank God. They said, "[O]k, we've done it[,]" and they got up on their bikes and left.

The victim also stated that she saw the person in a yellow hoodie open a wrapper with his teeth, and she assumed he was opening a condom. Ms. Griffin asked the victim to clarify if the assailants had penetrated her, and the victim responded, "A little; one of them may have done more, I don't know, I can't." At that point, the victim became upset, and Ms. Griffin stopped pressing her for more information.

A physical examination of the victim revealed that she had abrasions on her arms. She also had "debris, it was fragments of blackish/brown, could have been dirt" on the inside of her thighs, her labia, and "just under the vaginal opening." The victim also had two, small lacerations near her vaginal opening. Ms. Griffin stated that the lacerations were consistent with blunt force trauma and could have been caused by forced penetration. The internal examination showed that the victim's cervix was reddened and

that there was debris in the vaginal canal near the cervix that appeared to be similar to the debris found on the victim's thighs. Ms. Griffin stated that the victim's clothing had dirt and grass stains on them. The victim was not wearing underwear when she arrived at the Rape Crisis Clinic. Ms. Griffin also collected swabs for DNA samples.

CPD Officer Kenneth Burnette, Jr., testified that he responded to the crime scene on the morning of October 12, 2012, and collected a beer bottle, a cell phone, underwear, a plastic bag that contained gum, and an open Durex condom wrapper. Officer Burnette also stated that another officer collected an open Lifestyles condom wrapper. Officer Burnette noted that a plastic bag had been laid over some of the evidence in order to protect it from the rain. He stated that he would not have laid the plastic over the evidence because plastic was "not good for the preservation of DNA evidence." He explained that plastic allowed moisture to adhere to the evidence, possibly causing the DNA to break down.

CPD Officer Caleb Brooks testified that he collected an open, green Lifestyles condom wrapper from an embankment near Finley Stadium. A few days later, Officer Brooks collected DNA samples from Solomon Pierce, III, Deacon Williams, and the Defendant. On cross-examination, Officer Brooks said the Defendant was cooperative when giving a DNA sample.

Mark Hamilton testified that he worked for the CPD and often retrieved video evidence. In this case, he was asked to retrieve security footage from City Café for the morning of October 12, 2012. That video showed two black males, one wearing a dark blue hoodie and the second with an Afro and wearing a yellow hoodie, enter City Café around 4:40 a.m. to eat some food. The person in the yellow jacket appeared to be taking photos with a smartphone. They left City Café around 5:00 a.m.

Frank Poland testified that he was the director of technology and security at the Chattanooga Convention Center, which is located close to Finley Stadium. When Mr. Poland learned that a rape was alleged to have occurred near that area, he reviewed the Convention Center's security video. Mr. Poland saved the footage from two cameras and turned them over to the police. Both videos were played for the jury. The first camera showed a young woman jogging on Carter Street. Approximately twenty seconds later, the same camera showed two black males on bicycles pass the same area where the lady was jogging. One cyclist was wearing a dark jacket with its hood up and the second had an Afro and was wearing a yellow jacket. The second camera showed the same woman jogging toward Finley Stadium, followed "several seconds afterwards" by two black males. The bicyclists appeared to be the same two bicyclists depicted in the first video. Mr. Poland stated that the video was recorded around 5:53 to 5:54 a.m. on October 12, 2012.

CPD Sergeant Daniel Francis testified that, around 7:00 a.m. on October 12, 2012, he responded to a report of a rape near Finley Stadium. He spoke with the victim at the Rape Crisis Center. The victim stated that one attacker was wearing a yellow jacket and had big hair and that the other was wearing a dark jacket. Sergeant Francis also prepared a photo lineup to show to the victim. The victim identified the Defendant's photo as one of her assailants.

Sergeant Francis learned that individuals matching the victim's description of the perpetrators had been seen at City Café, and Sergeant Francis directed Mr. Hamilton to obtain the security footage from City Café. Sergeant Francis also reviewed the video from the Convention Center, and he noted that the City Café video and the Convention Center video appear to show the same people. Sergeant Francis noted that he obtained a DNA sample from Solomon Pierce, III, to eliminate him as a suspect, but he did not consider him to be a suspect for the rape.

About a week and a half after the offense, Sergeant Francis obtained a yellow jacket from Vontrell Haddox. Sergeant Francis explained that Mr. Haddox had come home wearing the jacket, and his mother identified the jacket as the one from the City Café video, that had been released to the news media, and she called the police. Sergeant Francis spoke with Mr. Haddox and asked where he had obtained the jacket. Mr. Haddox told Sergeant Francis that the Defendant "traded him the jacket." Mr. Haddox said he showed the Defendant photos from the City Café video, and the Defendant admitted he was in the photo. Later, the Defendant told Mr. Haddox that he wanted to give Mr. Haddox the yellow jacket from the video in exchange for Mr. Haddox's gray jacket.

Sergeant Francis went to the Defendant's residence on October 24, 2012. The Defendant was transported to the major crimes office, and his statement was taken. The video-recorded statement was played for the jury. In that statement, the Defendant admitted that he was the person in the yellow jacket in the video from City Café, but he denied raping anyone. He said that, after he left City Café, he rode his bicycle directly to Miracle Brown's house.[3] He also claimed that he had to go past the Convention Center in order to get to Miracle's house. Sergeant Bryant informed the Defendant that Deacon Williams claimed that both he and the Defendant attacked the victim, but that the Defendant was the only one who raped her. The Defendant responded that such account was not true. When Sergeant Francis asked, "You don't think [the victim] saw your face?" the Defendant responded, "Uh [ ], she might of [ ] well how could she?" Sergeant Francis asked why there was an hour's difference between when the Defendant was at City Café and when he rode by the Convention Center, but the Defendant could not explain the time difference. The Defendant agreed to provide a sample of his DNA. The

---

[3] Miracle Brown shares a common surname with Derica Brown, one of the witnesses in this case. To avoid confusion, we will refer to Miracle by her first name in this opinion. We intend no disrespect.

Defendant also said he gave the yellow jacket to Mr. Haddox "[c]ause [sic] he wanted to wear it."

On cross-examination, Sergeant Francis explained that he instructed patrol officers to cover evidence found at the crime scene with a plastic bag in order to protect it from the rain. Sergeant Francis also recalled that the City Café video showed a person wearing a yellow jacket and what appeared to be a "rather large" Afro wig and a male wearing a dark-colored jacket. Sergeant Francis also agreed that he could not see individuals' faces on either the City Café or Convention Center videos. However, he assumed the two videos depicted the same people because the person in the yellow jacket was the taller of the two in each video. He also noted that the victim reported that the person in the yellow jacket was the taller of the two assailants.

CPD Investigator William Salyers testified that, on October 25, 2012, he accompanied Sergeant Francis on a follow-up visit to the Defendant's residence as part of a rape investigation. Investigator Salyers collected two cell phones, two opened Durex condom wrappers, and a used condom from one of the bedrooms.

Special Agent Keith Proctor of the Tennessee Bureau of Investigation testified that he tested the buccal swab DNA samples from the victim, the Defendant, Mr. Williams, and Mr. Pierce against evidence found at the scene, DNA samples collected as part of the rape kit, and the red condom found in the Defendant's bedroom. No semen was found in samples taken during the rape kit or on the pink panties found at the crime scene. Special Agent Procter found sperm on the inside of the red condom, and the DNA profile matched that of the Defendant. However, Special Agent Procter said he did not find the victim's DNA on the outside of the red condom. Special Agent Procter tested the condom wrappers that were found at the crime scene for DNA evidence, but the tests did not reveal any human DNA. Special Agent Procter explained that semen may not be present in a rape kit if there was no ejaculation, the incident did not occur, the semen had degraded, or a condom was used.

Special Agent Proctor also tested a yellow Adidas jacket and a navy blue Aeropostale jacket for DNA. Both jackets contained partial DNA profiles for "at least two individuals, where at least one [was] male." Deacon Williams was identified as the "major contributor" for both jackets, and the victim, the Defendant, and Mr. Pierce were all excluded as potential contributors for the second DNA profile for both jackets. Special Agent Proctor explained that one would not always expect to find DNA on clothing. He noted that the DNA in question was "touch DNA," which was not as strong as DNA found in bodily fluids such as blood, semen, or saliva. He stated that the likelihood of obtaining a DNA profile from touch DNA is "much less" and that touch DNA might not be present if there was a two-week delay between when a person wore an

item of clothing and when it was tested. Additionally, he said washing an item of clothing "would definitely affect the amount of DNA that's present."

Derica Brown testified that she knew the Defendant by the name "Skeelo." Ms. Brown recalled that she lent the Defendant a cracked, LG smartphone with a pink case in October 2012. At the time she lent him the phone, the Defendant was wearing a yellow hoodie, an Afro wig, and blue jeans, and he was with Deacon Williams. The Defendant told Ms. Brown that he and Mr. Williams intended to go to City Café. She saw the Defendant the next day and asked for her phone back, but the Defendant said that he lost the phone when it fell out of a hole in his pocket. Ms. Brown reported that her phone was never returned to her. Ms. Brown identified the phone found at the crime scene as the same phone that she lent the Defendant. On cross-examination, Ms. Brown said she was "[n]ot really" close with either the Defendant or Mr. Williams but that they were friends. She explained that she lent the Defendant her phone because he wanted to listen to music. Ms. Brown also reported that the Defendant and Mr. Williams were together when they returned from their trip to City Café.

The Defendant, who was eighteen years old at the time of the offense, testified that, on October 12, 2012, he and his co-defendant, Mr. Williams, were at Miracle's house. They had been drinking and were hungry, so they left and went to Mr. Williams' house to get the yellow jacket because it was cold and rainy. Mr. Williams was also wearing a wig because it was "seventies day" at school, and the Defendant "asked to wear it, just goofing around." The Defendant and Mr. Williams left on bicycles and rode to City Café where they "ate some fries, drunk [sic] some drinks, and [they] was [sic] just chilling, just taking pictures, just laughing and talking."

After eating, the Defendant and Mr. Williams left to go back to the "west side." En route, Mr. Williams told the Defendant that he wanted to listen to a song, so the Defendant gave the phone to Mr. Williams. Shortly after that, the Defendant and Mr. Williams parted ways, and the Defendant gave Mr. Williams the yellow jacket and wig because they did not belong to the Defendant. The Defendant said he forgot to get the phone back from Mr. Williams. From there, the Defendant went back to Miracle's house and slept. The Defendant saw the yellow jacket the next day being worn by Mr. Haddox.

The Defendant denied telling Ms. Brown that the phone had fallen out of his pocket. The Defendant said it would take approximately fifteen minutes to get from Miracle's house to City Café via bicycle. The Defendant agreed that one of the condom wrappers found at the crime scene was the same brand and color as the condom wrappers found in his bedroom. However, the Defendant stated that everyone, including himself, got their condoms from the West Side Clinic. The Defendant said he did not rape the victim.

On cross-examination, the Defendant said he did not know where the wig or the MP3 player were. The Defendant said he was not the person captured on video following the victim on a bicycle while wearing the yellow hoodie and wig. The Defendant said he returned home "on a bike," but he also said that he gave Mr. Williams his bicycle when they parted ways.

The jury convicted the Defendant of aggravated rape and robbery. The trial court sentenced the Defendant to an effective twenty years' incarceration. This timely appeal followed.

## II. Analysis

*Evidence Found in Defendant's Bedroom*

On appeal, the Defendant argues that the evidence found in his bedroom should have been suppressed because the Defendant's arrest was an unconstitutional seizure, Ms. Bryant's consent was involuntary, and Ms. Bryant did not have the authority to consent to a search of the Defendant's bedroom.

When reviewing a motion to suppress, this court is bound by the trial court's findings of fact unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility, the weight and value of the evidence, and resolutions of conflicts in the evidence are resolved by the trial court. Id. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. Id. We review the trial court's conclusions of law de novo. State v. Carter, 160 S.W.3d 526, 531 (Tenn. 2005) (citing State v. Daniel, 12 S.W. 2d 18, 23 (Tenn. 1996)).

Both the United States and Tennessee Constitutions protect citizens from unreasonable searches and seizures. U.S. Const. amend. IV; Tenn. Const. Art. I, § 7. A warrantless search or seizure is presumed unreasonable, and the "evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997) (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971)). Exceptions to the warrant requirement include consent to search, search incident to a lawful arrest, evidence in plain view, searches and seizures conducted in "hot pursuit" of a fleeing criminal, a "stop and frisk" based on reasonable suspicion of criminal activity, and probable cause to search with exigent circumstances. State v. Bartram, 925 S.W.2d 227, 230 & n.2 (Tenn. 1992).

Whether a person voluntarily consents to a search is a question of fact that is to be determined from the totality of the circumstances. State v. Berrios, 235 S.W.3d 99, 109

(Tenn. 2007). In order for consent to be voluntary, it must be "unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." Id. (quoting State v. Simpson, 968 S.W.2d 776, 784 (Tenn. 1998)) (internal quotation marks omitted). "The pertinent question is this: whether the [individual's] act of consenting is the product of an essentially free and unconstrained choice. If the [individual's] will was overborne and his or her capacity for self-determination critically impaired, due process is offended." State v. Cox, 171 S.W.3d 174, 185 (Tenn. 2005) (citing Schneckloth v. Bustamonte, 412 U.S.218, 225-26 (1973). When determining the voluntariness of consent, factors to consider include: (1) "[t]ime and place of the encounter;" (2) "[w]hether the encounter was in a public or secluded place;" (3) "[t]he number of officers present;" (4) "[t]he degree of hostility;" (5) "[w]hether weapons were displayed;" (6) "[w]hether consent was requested;" and (7) "[w]hether the individual initiated contact with the police." Id. (citing 79 C.J.S. Searches and Seizures § 119(b) (1995 & Supp. 2004)).

Additionally, "a consent to search that is preceded by an illegal seizure is not 'fruit of the poisonous tree' if the consent is both: 1) voluntary, and 2) not an exploitation of the prior illegality." State v. Garcia, 123 S.W.3d 335, 346 (Tenn. 2003) (citing Wayne LaFave, 3 Search and Seizure § 8.2 (d) at 656 (3d ed. 1996)). To determine whether the prior illegality was sufficiently attenuated from consent to search, courts look to the following factors: (1) "the temporal proximity of the illegal seizure and consent;" (2) "the presence of intervening circumstances;" and (3) "the purpose and flagrancy of the official misconduct." Id. (citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975)). Attenuation issues are highly factual, and the burden of proving attenuation lies with the State. Id.

Voluntary consent can be given by a third party who has "common authority" over the premises or effects to be searched. United States v. Matlock, 415 U.S. 164, 171 (1974); State v. Ellis, 89 S.W.3d 584, 593 (Tenn. Crim. App. 2000). The United States Supreme Court has defined "common authority" as follows:

> The authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has a right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be search.

Matlock, 415 U.S. at 171 n.7. The State may also show that consent was valid "by demonstrating that the facts available to the searching police officers would have warranted "a man of reasonable caution in the belief that the consenting party had authority of the premises." Ellis, 89 S.W.3d at 593 (quoting Illinois v. Rodquiguez, 497 U.S. 177 (1990) (quoting Terry v. Ohio, 392 U.S. 1, 21-22 (1968))) (internal quotation marks omitted).

- 14 -

In this case, the trial court found that the Defendant was illegally arrested in his home without a warrant.[4] However, the trial court also found that Ms. Bryant had consented to a search of her home, that officers did not coerce her to provide that consent, and that the search was "sufficiently attenuated from the previous day's unconstitutional entry." Sergeant Francis testified that he and one other officer returned to the Defendant's residence the day after the Defendant was arrested and asked Ms. Bryant to sign a form consenting to the search of her home. He also stated that he went over the form in detail with Ms. Bryant. Ms. Bryant confirmed that she could read and write and that she did not feel pressured to sign the form. Further, although she claims she did not know the officers were going to search her residence, she did know that she consented for them to come in and "look around," and she did not object to them searching the Defendant's bedroom. Further, a day passed between the time the Defendant was arrested and when Ms. Bryant gave consent to search. As to intervening circumstances, Sergeant Francis explained the consent form in detail before asking Ms. Bryant to sign it. Finally, regarding the flagrancy of the official misconduct, the Defendant was arrested in his home without a warrant, and Ms. Bryant's reaction was simply to say, "Well, last time that happened, they brought him back the same day." Based on the record before us, we are unable to say that the trial court erred when it found that Ms. Bryant voluntarily consented to the search and that her consent was sufficiently attenuated from the Defendant's illegal seizure.

The Defendant also argues that Ms. Bryant did not possess common authority to consent to a search of his bedroom. The record reveals that the Defendant slept in Ms. Bryant's home approximately every other night and shared a room with his brother. Further, Ms. Bryant stated that she went into the Defendant's bedroom "all the time." Sergeant Francis stated that Ms. Bryant led the officers to the Defendant's bedroom and that he thought Ms. Bryant had the authority to consent to a search of the Defendant's room because she was on the lease. Based on the record, there were sufficient "facts available to the searching police officers [that] would have warranted a man of reasonable caution in the belief that the consenting party had authority over the premises." See Ellis, 89 S.W.3d at 593 (internal quotation marks omitted); see also State v. Woods, 806 S.W.2d 205, 209 (Tenn. Crim. App. 1990)(homeowner's consent effectual because she had common authority over a family member's bedroom when homeowner occasionally entered the bedroom). The trial court did not err when it allowed the evidence found in the Defendant's bedroom to be admitted at trial. The Defendant is not entitled to relief on this issue.

---

[4] The State in its brief does not contest the trial court's finding that the Defendant's seizure was illegal.

*Videotape of Victim's Statement*

Initially, we note that the Defendant does not challenge, and we are not determining, whether the admissibility of the forty-seven minute video tape recording of the victim recounting her attack constitutes an excited utterance.[5]  Rather, the Defendant contends that the video recording from Officer Slaughter's patrol car showing the victim immediately after the offense should have been excluded under Tennessee Rule of Evidence 403.  The Defendant notes that the jury was provided a transcript of the video and argues that the video's depiction of the victim's emotional state was "overly inflammatory" and that its prejudicial effect "was not outweighed by the video's probative value."  The State argues that the video was relevant to establish the circumstances of the offense and to provide a description of the assailants and that its probative value was not substantially outweighed by the danger of unfair prejudice.

In order for evidence to be admissible, it must be relevant.  Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence." Tenn. R. Evid. 401.  However, even if evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."  Tenn. R. Evid. 403.  We review a trial court's ruling regarding the admissibility of evidence for an abuse of discretion.  State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008).

The trial court did not abuse its discretion when it ruled that the video recording of the victim's statement was admissible under Rule 403.  Although it is obvious that the victim was extremely upset at the time the video was recorded, she was able to describe the rape in detail to Officer Slaughter, and she was able to give a description of her assailants.  Cf. State v. Michael Lynn Stanton, No. E2003-02675-CCA-R3-CD, 2005 WL 876873, at *12 (Tenn. Crim. App. Apr. 15, 2005), perm. app. denied (Tenn. Oct. 24, 2005) (probative value of audiotape substantially outweighed by its prejudicial effect when the victim can be heard "moaning, sobbing, and screaming in grief and hysteria" but none of her statements were discernable, adding nothing to her testimony).  That description was later used to locate the City Café and Convention Center security footage.  Additionally, after the City Café footage was released to the media, officers were able to locate the yellow jacket and identify the Defendant as a suspect.  Moreover, the victim's description of the suspects and of the rape in the video was consistent with her testimony at trial.  Although the victim was upset throughout the recording, the recording was also relevant to showing the victim experienced a traumatic event and was relevant to her credibility.

---

[5] Interestingly, the Defendant agreed to its admission as an excited utterance and moved for the admission of the entire tape into evidence.

To the extent that the Defendant argues that the transcript should have been submitted to the jury instead of the video, the video recording was the best evidence, and the trial court did not err in admitting the video rather than the transcript. See Tenn. R. Evid. 1002. The Defendant is not entitled to relief on this ground.

*Sufficiency of the Evidence*

Finally, the Defendant argues that there was insufficient evidence to support his conviction for aggravated rape because "[t]he DNA evidence produced at trial did not implicate or connect the Defendant to the rape." The State argues that there was sufficient evidence to support the Defendant's conviction for aggravated rape. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. Id. The standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. Bland, 958 S.W.2d at 659; Tuggle, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

The identity of the perpetrator is "an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence . . . ." Id. (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

As charged in this case, "[a]ggravated rape is unlawful sexual penetration of a victim by the defendant or the defendant by the victim accompanied by any of the following circumstances: . . . (3) [t]he defendant is aided or abetted by one (1) or more

- 17 -

other persons; and (A) [f]orce or coercion was used to accomplish the act[.]" Id. " 'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Id. " 'Force' means compulsion by use of physical power or violence and shall be broadly construed to accomplish the purposes of [Title 39 of Tennessee Code Annotated.]" Id.

In this case, the victim was choked until she passed out. When she regained consciousness, the person in the gray hoodie demanded that she perform fellatio or remove her pants. A second man in a yellow hoodie and Afro wig told the victim that he had a knife and that he would "break [her] face" if she screamed. When the victim tried to flee, the person in the gray hoodie removed her pants, and then both men raped her. The victim stated that neither assailant's penis was fully erect but that both men penetrated her. The victim sustained injuries to her vagina that were consistent with blunt force trauma often caused by forced penetration, and her cervix was reddened and debris was found inside her vaginal canal. The victim identified the Defendant in the photo lineup and at trial as the person with the Afro wearing the yellow hoodie.

Although the Defendant claimed that he gave the phone, wig, hoodie, and bike to Mr. Williams soon after leaving City Café, the jury clearly discredited his testimony. In his statement to police, the Defendant said that he gave the yellow hoodie to Mr. Haddox because he wanted to wear it. Further, the Defendant admitted that he was at City Café with Mr. Williams wearing a yellow hoodie and Afro wig and that he appeared in the City Café security footage dressed in that attire. An hour later, the Chattanooga Convention Center security footage shows two people of similar stature and wearing similar clothes as those in the City Café footage following the victim on bikes. Moreover, the phone Ms. Brown lent to the Defendant was found at the crime scene, and Ms. Brown testified that the Defendant and Mr. Williams returned to her residence together. Even absent DNA evidence linking the Defendant to the rape, the evidence was sufficient for the jury to conclude that the Defendant and another person used force in order to unlawfully sexually penetrate the victim. Therefore, the Defendant is not entitled to relief on this ground.

### III. Conclusion

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE